### NEW YORK & QUEENS GAS CO. v. NEWTON, Atty. Gen., et al.

(District Court, S. D. New York. December 13, 1920.)

No. 16–44.

1. **Gas ⟨key⟩14(1)—In suit to enjoin rate as confiscatory, court cannot fix rate.**

The courts are not rate-making bodies, and in a suit by a gas company to enjoin as confiscatory a rate fixed by statute, questions which might be pertinent where it was sought to fix a rate may prove academic; the only question being whether the rate fixed by statute was in fact confiscatory.

2. **Gas ⟨key⟩14(1)—Single year sufficient basis for calculation of cost of production.**

The cost of producing gas for a single year preceding the filing of a suit to enjoin, under then existing conditions, enforcement of a statutory rate as confiscatory is a sufficient basis for the cost of production, and a rate base for the future long enough to call for judicial action.

3. **Evidence ⟨key⟩354(18)—Books of gas company, seeking to enjoin as confiscatory statutory rate, admissible.**

Where defendants, members of a Public Service Commission, had full facility to examine and test the accuracy of the books of a gas company, seeking to enjoin as confiscatory the statutory rate, such books were admissible in evidence, as common-law proof of each of the items would be a practical denial of justice.

4. **Gas ⟨key⟩14(1)—Cost of defensive emergency service should be excluded, in computing cost of gas production.**

In a suit to enjoin the enforcement of Laws N. Y. 1906, c. 125, prohibiting the charging of more than $1 per thousand feet for gas, the cost of defensive emergency service maintained by the complainant gas company should be disregarded in ascertaining whether the rate was confiscatory.

5. **Gas ⟨key⟩14(1)—Expenses of litigation should be excluded in ascertaining whether rate was confiscatory.**

In a suit to enjoin the enforcement of Laws N. Y. 1906, c. 125, on the ground the maximum rate of $1 was confiscatory, expenses of the injunction suit should be excluded.

6. **Gas ⟨key⟩14(1)—Interest on unpaid taxes should be excluded in suit to enjoin statutory rate as confiscatory.**

In a suit to enjoin the enforcement of Laws N. Y. 1906, c. 125, fixing a maximum rate of $1 on the ground that it was confiscatory, interest on unpaid taxes should be excluded in ascertaining the cost of the gas as that was not the proper charge under the head of distribution.

---

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. Gas ⊗══14(1)—Federal tax on bondholders' income should not be considered, in determining whether rate was confiscatory.**

Where a statutory gas rate was attacked as confiscatory, the federal tax on the income of the holders of the gas company's bonds should not be charged as part of the expense of distribution or production.

**8. Gas ⊗══14(1)—That municipality was entitled to receive gas at lesser rate does not make rate to individuals confiscatory.**

In a suit to enjoin the enforcement of Laws N. Y. 1906, c. 125, fixing the maximum rate for gas at $1 per 1,000 feet, on the ground that the rate was confiscatory, the fact that the city of New York was entitled to receive gas at the rate of 75 cents per 1,000 cannot be considered in determining whether the rate to private consumers was confiscatory.

**9. Gas ⊗══14(1)—Rate fixed by statute held confiscatory.**

The maximum rate of $1 per 1,000 fixed by Laws N. Y. 1906, c. 125, for gas, *held*, in view of the cost of production and distribution (viz. $1.0129), confiscatory, so that the enforcement of the statute should be enjoined.

**10. Courts ⊗══92—Expressions of opinions on questions beyond requirements of case are dicta.**

In a suit to enjoin as confiscatory a statute fixing a maximum gas rate, where the evidence established that the net cost of production and distribution made the rate confiscatory, expressions by the court as to the rate base or theories in respect thereof or disputed questions not involved in ascertaining the net cost of production and distribution, or as to any questions which go beyond the requirements for determination of the only question involved are dicta, and amount merely to the court's expression of opinion.

In Equity. Suit by the New York & Queens Gas Company against Charles D. Newton, as Attorney General of the State of New York, Denis O'Leary, as District Attorney of the County of Queens, and Lewis Nixon, constituting the Public Service Commission for the First District. On motion by complainant for permanent injunction on the report and opinion of the special master, to which each of the parties had filed exceptions. Injunction granted.

The opinion of Abraham S. Gilbert, as special master, is as follows:

The complainant New York & Queens Gas Company is engaged in the business of manufacturing gas in that part of New York City known as Flushing. It delivers gas to consumers in the Third ward of the borough of Queens in the city of New York. By statute it is required to furnish gas to its private consumers at a price not exceeding $1 per 1,000 cubic feet. It is also required by statute to furnish gas to the municipality at a price not exceeding 75 cents per 1,000 cubic feet.

In this action the complainant company attacks the constitutionality of the statute which limits its charges to private consumers to the sum of $1 per 1,000 cubic feet, upon the ground that such statute is confiscatory of its property. The complainant contends that it does now and has for some time past cost more than $1 per 1,000 cubic feet to make, distribute, and deliver the gas to its consumers. If that claim is sustained by the evidence in this case, the value of the property used in the manufacture and distribution of the gas is of only secondary importance. The question involved in this case is not what rate ought to be authorized by statute, or by order of the defendant Public Service Commission, had no statutory limitation been imposed, but whether the maximum rate now permitted by statute is confiscatory.

*Necessary Elements in Complainant's Operating Costs.*—It is conceded at the outset that, in order to make gas, it is necessary to have coal, oil, and other incidental manufacturing material and the labor necessary to make and distribute the gas. It is also conceded that, in the operation of a gas plant, repairs are required which call for repair material and repair labor. In or-

der to determine the cost of making and distributing gas, it becomes important to find out how much of the various materials is actually and reasonably used in the manufacture of gas and the reasonable cost of that material; the amount of labor required in the manufacture of gas, and the reasonable cost of that labor; the amount of repairs required, on the average, and the amount of material and labor required for that purpose, and the reasonable cost thereof; and the reasonable expenses of managing the business, delivering the gas to the consumers, and collecting the moneys payable therefor, including the necessary clerical hire, the pay of meter readers, indexers, and bill clerks, the executive salaries, and the like.

*Scope of the Complainant's Proofs.*—For the purpose of proving the quantity and cost of materials, labor, and the like, as well as the revenues and expenses of its gas business, the complainant company presented to me, as previously to the accountants and experts of the defendants, all of its invoices and vouchers for coal, oil, and other materials and supplies purchased, together with its various pay rolls, works reports, records of manufacture, office reports, and the like, together with its books of account, in which the items of expenditure and revenue shown by these underlying records had been entered. All of this data covered the year 1919 and the first five months of the year 1920. To the invoices for coal, oil, and other materials were attached the certificates evidencing the receipt of the quantities indicated, and to the oil invoices were also attached the certificates of the New York Produce Exchange inspectors, attesting the quantity and quality of the oil delivered. The public accountants employed by the complainant had checked these vouchers and records to the books and certified to the accuracy of both. There was also submitted to me the sworn testimony of qualified witnesses as to the actual cost of oil, coal, and other materials from 1906 down to the present time, including the years 1919 and 1920, and the sworn testimony of experienced operating engineers as to the quantities of coal, oil, and other materials, and of the labor, actually required for the manufacture of gas, and the wages necessarily paid to labor during this period, including 1919 and the first five months of 1920.

The defendants also offered in evidence data showing the operating results, the unit quantities of materials used, the unit costs thereof, and other information as to the revenues and expenses of the complainant company during the years from 1906 to 1920. Various of the underlying records of 1918 and prior years were also produced in court at the instance of the defendants, and various of the entries in the books of the complainant and its predecessor company were placed in evidence by the defendants.

*Increased Sales and Increased Costs.*—The evidence before me is practically without dispute that since the 1st of January, 1920, labor cost has considerably increased over the year 1919, and that material cost has considerably increased over the year 1919. On the other hand, the vice president and operating manager of the complainant, Mr. Spear, stated on one of the closing days of the trial that in his judgment the sales of the complainant company during 1920 will be about 15 per cent. in excess of the sales during 1919. In my opinion, a finding to this effect is justified and required by all the evidence, although counsel for the complainant points out that from 1918 to 1919 the increase in sales was only 2.6 per cent., and that the average increase during the past five years has been only 7.02 per cent.

An increase of 15 per cent. in the volume of sales will, in my judgment, necessarily tend to reduce the cost, in terms of cents per 1,000 cubic feet of gas sold, of certain of the items classified as distribution costs, particularly in the category of commercial and general office expenses. Any such decrease in the unit cost of these commercial expenses (in the meter-reading, bookkeeping, and billing departments, for example) will probably prove less than would otherwise be the case, by reason of the fact that the company's present office force is small, and is compelled to work on an overtime basis to look after the present volume of sales, and additional staff may be required for increased sales; but, as fairly as I can figure it, increased sales of 15 per cent. over 1919 would ordinarily make a difference of about 4 cents per 1,000 cubic feet, in the distributing cost of the gas sold by the complainant.

Any such saving in the unit expenses of the general office and commercial departments will, however, be at least absorbed by the increased cost of gas manufacture and the increased cost of the labor and material entering into the work of distribution, so that the net effect on the unit distribution costs as they now appear for 1920 will be that, despite the prospective increase in sales the gas as delivered to the consumer, including the commercial expenses, does and will cost considerably more per 1,000 cubic feet than in 1919 or early 1920.

*1920 Costs Higher Than Those of 1919.*—If, therefore, the actual results of operations for the year 1919 show the rate to be confiscatory, it follows that the net result of operations for the year 1920, which can only be determined in definite figures when the year has ended and the books for 1920 have been closed, will show a larger deficiency than appeared as the result of operations in the year 1919. I have therefore concluded to base my findings as to the cost of making and distributing gas especially upon the operations and costs established for the year 1919, those figures being taken, of course, in the light of what I have just said, that the cost of making and distributing gas in the year 1920 will be in excess of the figures I reach for the year 1919.

*Details of 1919 Costs as Shown by the Company's Books.*—The books of account, vouchers, manufacturing records, works reports, and the like of the complainant company were placed at the disposal of the defendants, more than six months in advance of the beginning of the trial before me, along with copies of the principal statistical exhibits which the complainant proposed to offer in evidence upon the trial, and were carefully and thoroughly examined and analyzed by counsel for the defendants, their accountants, and engineers. These operating records show that in the year 1919 the actual cost of the gas made at the complainant's works was 63.45 cents per 1,000 cubic feet of gas made, and that the loss in volume, based upon the quantity of gas metered at the consumers' premises, to which I shall presently refer in discussion of this so-called "unaccounted-for gas," was 11.03 per cent. of the gas made. On that basis, the complainant's actual cost of making gas in the year 1919 was 71.73 cents per 1,000 cubic feet of gas sold. The actual distribution expenses, including the commercial expenses (and including also an item of 0.22 cents for defensive emergency service still required in 1919, and 4.62 cents on account of the expenses of the present suit in equity, totaling 4.84 cents, both of which items it is my judgment that I ought to disregard for the purposes of my present inquiry, for reasons hereinafter indicated), aggregated 32 cents per 1,000 cubic feet sold; renewals and replacements, 3 cents per 1,000 cubic feet sold; taxes and interest thereon, 7.07 cents per 1,000 cubic feet sold, making a total actual cost of $1.138 per 1,000 cubic feet of gas sold. The complainant's income from the sale of gas in 1919, according to these same books and records, was 99.51 cents per 1,000 cubic feet, showing a deficiency below actual cost of 14.29 cents per 1,000 cubic feet of gas sold. As against this deficiency, however, the complainant company credits the account with the profit made on its sale of gas appliances, the moneys received as rental of such appliances, and certain interest items, aggregating 6.75 cents per 1,000 cubic feet of gas sold, leaving a net deficiency during the year 1919 of 7.54 cents per 1,000 cubic feet of gas sold, or, in money, the sum of $25,340.89.

*The Uniform System of Accounts.*—It becomes important, therefore, to determine whether these figures appearing in the books and records of the complainant company have been sustained and confirmed by the proofs submitted in the present record, and whether any of the items of expenditure shown in the accounts should be disregarded by me in determining whether the statutory rate was and is confiscatory.

The books and accounts of the complainant company, like the accounts of all other gas companies in the city of New York since the year 1908, have been kept under the jurisdiction of the defendant Public Service Commission of the state of New York for the First district. The Public Service Commission has prescribed a uniform system of accounts, which is observed by the complainant company, and possesses authority to examine the complainant's books and records at all times, and require changes in the accounts, if deemed advisable.

The powers and duties of the defendant commission are set forth in full in the statute known as the Public Service Commissions Law, and it is unnecessary, I think, for me to dwell at length upon the provisions of that statute at this point.

*Unit Quantities of Materials and Labor.*—The first question to determine is whether the quantities used by the complainant company, as they appear from the books and records of the company, are correct and set forth a reasonable and necessary use of materials and of labor, or whether there has been a waste of gas-making material and unnecessary use of labor forces, and the books do not accurately reflect the quantities actually needed and used. I have analyzed these figures in the light of the defendants' proofs, and also of the sworn testimony given by Mr. Woods, an operating engineer of wide experience produced by the complainant company, whose testimony has not been directly attacked or contradicted by any witness. Except for some minor variances, when contrasted with the 1919 operating results, such as his estimate of "unaccounted-for" gas at 10 per cent. (the record for 1919 shows 11.03 per cent.), his slight underestimate of the required boiler fuel, and the slight difference as to the figures given by him for the gas oil required, it may be said that the results shown in the operating records closely accord with the sworn expert opinion of Mr. Woods, and are confirmed by his judgment as to the results which might reasonably be looked for and secured.

*Complainant's Records Accurately Kept and Reflect Efficient Results.*—As to some items, the complainant company in 1919 did a little better than Mr. Woods said he would expect to find its operating staff doing under average operations as of the present time. As to gas oil, Mr. Woods' estimate was the average use of 4.2 gallons per 1,000 cubic feet; the operating results showed an actual use of 4.19 gallons in 1919 and of 4.26 gallons in 1918. As I have already indicated, Mr. Woods thought that the "unaccounted-for" gas would ordinarily not exceed 10 per cent.; whereas, the operating records showed an actual unaccounted for in 1919 of 11.03 per cent., which seems to me a reasonable figure, having in mind all present conditions. On the whole, I am convinced that the operating records of the complainant company have been honestly and accurately kept, and accurately reflect actual, efficient, and reasonable operating results. In arriving at a conclusion, therefore, in this case, I have accepted the actual operating results for the year 1919 as they appear from the books of the complainant company, showing the cost of manufacture to be 63.45 cents per 1,000 cubic feet of gas made.

*The Volume of "Unaccounted-for" Gas.*—The question of the so-called "unaccounted-for" gas becomes important, in order to determine the cost of the gas actually supplied to consumers. It is conceded that there is an unavoidable loss in gas volume, known in the art as "unaccounted-for" gas. The fact that in any year, in order to deliver a certain number of million cubic feet of gas to consumers, a larger quantity of gas has to be made and sent out than is ever metered on the consumers' premises, is one of the factors affecting and determining the cost per 1,000 cubic feet of the gas delivered to the consumers. Counsel for the defendants contend that the "unaccounted-for" gas of the complainant in the year 1919 was greater than in prior years. That appears to be the fact. I am asked by counsel for the defendants to find that this increase in the "unaccounted-for" gas during the year 1919 has not been explained by the complainant. I am unable to make such a finding, because there is ample evidence in the case indicating that it is practically impossible to regulate the amount of "unaccounted-for" gas, and that factors were operative in 1919 which tended to increase the percentage. Weather and other conditions affect the gas in such manner and form that it is impossible to say that "unaccounted-for" gas should be kept below a certain percentage. Some years it seems to run very high, and in other years it seems to run quite low. This variance is caused by a number of changing conditions. I feel that I am compelled, in considering the operating results of the complainant company, to accept the actual conditions as I find them during the year 1919, and to accept the "unaccounted-for" gas at the figure of 11.03 per cent., which was the exact amount of such loss in volume during that year. In this connection, of course, it should be borne in mind that in 1920, or in some subsequent year,

this percentage may be lessened, so that the actual cost of making the gas in such year, if based upon the rates of pay for labor and the prices of materials prevailing in 1919, might be somewhat less than the figures now shown for 1919. But here, again, it should be noted that, although there may be a reduction in the percentage of "unaccounted-for" gas, whatever reduction may take place from such a cause will be more than absorbed and offset by the increased cost of materials and of labor. Upon the basis of 11.03 per cent. of "unaccounted-for" gas, the complainant's actual cost of manufacture during the year 1919 was 71.73 cents per 1,000 cubic feet of gas sold.

*The Cost of Distribution.*—This brings me to the cost of distribution and other expenses, including the commercial expense. The defendants challenge only four of the items included in this general item of "distribution and other expenses." They ask me to strike out from the 1919 outlays the item of $747.46 for "defensive emergency service"; the item of $15,518.73, representing the charges made in 1919 on account of the expenses of the present rate suit; interest on insurance, amounting to $57.58; and increased fire insurance, $477.30. I cannot agree with counsel for the defendants in their claim that I ought to eliminate the item "interest on insurance, $57.58" and the item "increase in fire insurance, $477.30."

*Eliminated Items.*—I do, however, agree with counsel for the defendants that, for the purposes of the test I am required to make in this case, I should eliminate the amount charged in 1919 to the account of the present rate case, amounting to $15,518.73 and the items appearing in the 1919 accounts for defensive emergency service, amounting to $747.46. I limit my statement as I have with respect to these two items last mentioned, because I agree with counsel for the complainant that in establishing a new rate an allowance must be made for the necessary expense to which the complainant company has been put in establishing its right to charge an adequate and remunerative rate for the gas sold by it, despite the existing statutory limitation, which I herein find to be confiscatory. I draw a distinction between analyzing the usual and necessary operating expenses of the company for the purpose of determining whether, in the first instance, the maximum rate fixed by statute is confiscatory, and the analysis of the complainant's expenses which must be made in fixing the fair rate for the future. The latter, of course, must make provision for the complainant's reimbursement for the expense of freeing itself from a statute which the complainant has proved to be confiscatory. That, however, remains to be considered in the fixation of a new rate.

The two items which I have thus stricken out for the purposes of the present inquiry aggregate $16,266.19. The total amount of actual distribution expense for 1919 was $107,597.82. Deducting $16,266.19 from $107,597.82 gives $91,331.-63; this divided by 336,000,000 cubic feet, sold in 1919, makes the allowable distribution expense approximately 27 cents, instead of 32 cents, as shown on the books of the complainant company.

*Renewals, Replacements, and Taxes.*—The item of the cost of providing for the renewal and replacement of property withdrawn from service seems to be agreed upon by all parties at 3 cents per 1,000 cubic feet of gas sold. As to the taxes and interest thereon, amounting to $23,794.71, or 7.07 cents per 1,000 sold, the defendants ask me to eliminate the interest on unpaid taxes, amounting to $233.71, and the federal income tax item of $443.25. I doubt whether these items, particularly the latter, should be included in the cost of taxes to the complainant company; but, if I should eliminate either or both of them, it would make no substantial change in the tax figure, so that, in arriving at my figures, I have taken the tax item as 7.07 cents per 1,000 cubic feet of gas sold.

*Conclusions as to 1919 Results.*—There appears to be no dispute that the income from sales of gas amounted to 99.51 cents, nor does there appear to be any dispute as to the amount of credit for miscellaneous operating revenue, viz. 6.75 cents per 1,000 cubic feet of gas sold. I have reached the conclusion, therefore, that the actual cost of making and distributing gas during the year 1919, including taxes and the renewal and replacement of property, was $1.088, against which there is to be credited 6.75 cents, leaving a net cost of $1.0205, or a deficiency over the sum realized from gas sales (99.51 cents) of

2.54 cents per 1,000 cubic feet of gas sold. This sum, multiplied by 336,241,400 cubic feet of gas sold during the year 1919, gives $8,540.53 as the actual deficiency in operating expenses for the year 1919, without regard to any return upon any of the complainant's investment in the property used in its gas business. These figures show a confiscation of the complainant's property in 1919, and a confiscation thereof to an even greater extent thus far in 1920, and there might appear to be no necessity for my going further and ascertaining the present fair value of the property, upon which the complainant was and is entitled to earn a reasonable return. Both sides, however, have asked that I make findings with respect to the complainant's property and its value, and in order that the reviewing court may have before it the exact situation of the complainant, I have made my findings in detail with respect to the property and its value.

*Franchises and Rights Acquired by the Complainant.*—The complainant company was organized in the month of July, 1904. Between the time of its organization and its merger with the Newtown & Flushing Gas Company, it acquired all of the outstanding securities of the Newtown & Flushing Gas Company. It issued for these securities its own securities—$600,000 of stock and $650,000 of bonds. At the time of the merger, the complainant company apparently, so far as this record discloses, owned no property, had no cash, and had no assets of any kind or description. No inventory and appraisal of the property acquired by the complainant seems to have been made the basis of the merger. The securities issued by the complainant for this purpose cannot, it seems to me from the present record, be considered to have been worth more than the property thereby acquired. The Newtown & Flushing Company, when it was merged with the complainant company, owned certain tangible and intangible properties, including certain franchises issued by various village and town officials. No proof was offered tending to show any specific sums as paid to the public authorities for franchises, or what specific amounts were paid by the companies which acquired these franchises to the persons and corporations which theretofore owned them. The record does not show to what extent the cost of these franchises and rights to the Newtown & Flushing Gas Company, as shown by its books placed in evidence by the defendants, represented actual payments for the same to public authorities by that company or its predecessors.

*Agreement as to the Cost of Present Tangible Property.*—Fortunately, there has been agreement between the parties upon this record as to the cost, up to and as of August 1. 1904, of the tangible properties still in existence and use, which were acquired by the complainant company on that date. The complainant and the defendants agree that the tangible property acquired on August 1, 1904, and still in existence and use, did cost, and as of that date was reasonably worth, at least $280,108, and I accept that figure in arriving at the complainant's total investment and the present value of its property. Since that date, the net additions to the plant and property of the complainant have cost $850,389.08, and there is no dispute as to this item. These two items, not in controversy, cover the actual cost of the tangible property now in use, aggregating $1,130,497.08.

*Additional Elements of the Original Investment.*—To the first of these items, the complainant asks me, on the basis of Mr. Miller's testimony and the book entries as of 1904 and subsequent years, to add $320,350 for the preliminary organization and development expenses of the enterprise and other items of cost set forth in Mr. Miller's estimate (Complainant's Exhibit 96). It is conceded by the defendants that in the initiating of a gas enterprise there is necessarily incurred preliminary and development expenses, cost of financing, engineering and superintendence expenses, interest and taxes during construction, and the like, as to which varying amounts were testified by the witnesses on each side, principally based upon opinions as to the proper percentages to be allowed for such items. The defendants contend, moreover, that there is no adequate proof before me on which I should base any finding of value for the franchises and rights.

*"Going Value."*—The complainant further contends that, under the decisions of the courts, I must include in my figures, if they are to be complete and state the full reproduction cost, an amount for so-called "going value." **I**

readily agree that, in arriving at a statement of the full cost of bringing such a gas project into being and its business to a profitable point, an allowance for "going value" would have to be included. The complainant's testimony in this case was that these elements of cost, commonly referred to as "going value," would, as to this company, amount to at least $500,000. My present task, however, does no necessarily call for such an effort to cover specifically all elements of reproduction cost. I also readily accept the argument that, in arriving at the cost of the tangible and intangible property of the complainant, I should expect to find that the franchises and rights had cost a substantial sum, and that some allowance must be made for the necessary, but undistributable, expenses already referred to. The difficulty here, however, is in finding a satisfactory figure from the evidence available in this record.

The $650,000 of bonds originally issued by the complainant company upon the purchase of the securities of the Newtown & Flushing Company are probably now in the hands of persons who at that time had no connection with the Newtown & Flushing Company. All of the stock of the complainant company is owned by the Consolidated Gas Company of New York. As ·I have already pointed out, one difficulty here is that I have not before me the satisfactory basis for a finding that the securities issued by the complainant company were worth any more than the book value of the tangible and intangible property acquired, or that under the circumstances already referred to, such property, at the time it was acquired, had cost or was worth more than was shown by the books of the company from which it was acquired.

*Basis of Finding as to Undistributable Structural Costs.*—At the time of the merger of the Newtown & Flushing Gas Company into the New York & Queens Gas Company, the total property and assets of the former (exclusive of working capital) were carried on the books of the former at $694,678.00. Since that time, plant and equipment so acquired by the complainant on August 1, 1904, has been retired, at a book cost totaling $24,189.14. The tangible property acquired on August 1, 1904, and still in service, is agreed to have cost before August 1, 1904, and to have been worth on that date, the sum of $280,108, exclusive of franchises and rights and "going value," and the undistributed structural items under consideration. The deduction of these two items from the book total of $694,678 leaves only $390,380.86 as representing the book cost to the Newtown & Flushing Gas Company of the franchises and rights, the "going value," and the undistributable structural items hereinbefore mentioned. There is sufficient evidence to warrant my conclusion upon the present record that the item of "franchises, good will, etc.," on the books of the complainant and its predecessors, covered, among other things, preliminary and development expenses, and the various other items which Mr. Miller puts in at a total of $320,350, and also the cost of "franchises and rights," which Mr. Miller puts in ,at $500,000; and I think it will be fair for me to say, for the purposes of the present case, that for all of these items just referred to the New York & Queens Gas Company actually paid no more than their book cost to the Newtown & Flushing Gas Company and its predecessors, viz. $390,380.86, and that these elements had cost the Newtown & Flushing Gas Company and its predecessors, and were worth, on August 1, 1904, at least that sum.

*Working Capital.*—To the cost of the present property acquired in 1904 and the net additions to such property since 1904, totaling $1,520,877.94, there must be added an item for materials and supplies, cash on hand and in banks, and the like, commonly called working capital. The experts for the defendants figure this item for the year 1919 at $80,000. Mr. Miller, on behalf of the complainant company, figures the item at $165,000. The expert witnesses called by the defendants frankly concede that the amount to be allowed for working capital is such amount as reasonable business men of experience would require in the conduct of this kind of a business. Taking into consideration the various elements which are and must be provided for in arriving at the necessary amount of working capital, I have reached the conclusion that $135,000 would be a fair sum to be allowed for working capital. I therefore reach the conclusion that the tangible and intangible property, including working capital, used and useful during the year 1919 and as

of January 1, 1920, by the complainant company in the conduct of its gas business, represents an actual investment, and is reasonable and fairly worth at this time, at least the sum of $1,655,877.94, and that it is on at least this amount that the complainant company was and is entitled to have its rate such as to yield a fair return.

*Cost and Present Value of Land.*—In view of some statements made by me on the record with reference to the value of land and my statement that I would fix the value of land at about $44,000, I should add that upon analyzing the figures I found that land acquired prior to August 1, 1904, is included in the agreed item of $280,108 at $19,423, plus grading and filling, $5,000, making $24,423 for land unimproved, and that additions to real estate since 1904, have cost the complainant $20,630.90, a total of a little more than $45,153.90.

*Compliance with Candle-Power Statute.*—Statements made by me on the record indicate my views as to the claim made by counsel for the defendants that the complainant company was not entitled to equitable relief because of its alleged failure to comply with the statutory requirements as to candle power, and I therefore deem it unnecessary to say anything further herein upon that subject, which I discussed at considerable length in my opinion as special master in the Consolidated Gas Company Case. In view of the similarity of the record facts, I refer to that opinion for a fuller statement of my views upon the subject. I am clear that this complainant has complied with the candle-power provisions of the statute.

*Basis of Finding of "Present Value."*—It is proper for me to say, before concluding this opinion, that I have based my finding of fair present value upon what I conceive to be the actual cost of the property to the complainant company. My reasons for the adoption of this criterion or standard of present value in such a suit as this were set forth at length in my opinion as special master in the Consolidated Gas Company Case, to which I refer for a more comprehensive statement of those reasons. In my opinion the property now used by the complainant company is worth at least that sum.

*The Undisputed Testimony as to Present Reproduction Cost.*—The complainant company offered testimony as to the present reproduction cost of the tangible property of the complainant company. The proof was undisputed that the complainant owns and uses the items of tangible property which it inventoried as of January 1, 1920, and that, exclusive of working capital and the undistributable structural costs, the cost of reproducing the tangible property, as of January 1, 1920, would be at least $2,099,621, as compared with the complainant's actual and unimpaired investment in the same tangible items of only $1,130,497.08. In other words, leaving out working capital and the undistributable working costs, it would cost nearly twice as much to reproduce the tangible property to-day as it did actually cost the complainant and its predecessors.

Of course, to this figure of $2,099,621, to reach a complete figure of present reproduction cost, there must be added amounts, based on the present cost of such items, for organization and development expenses prior to construction; cost of financing; engineering, superintendence, and general contractors' expense and profit; interest during construction; taxes on land during construction; the cost of franchises and rights; administrative, legal, and miscellaneous expenses during construction; certainly the sum of $135,000 for working capital; and perhaps also a suitable amount for "going value." The above-stated investment figure of $1,130,497.08 likewise does not include any allowance for the cost of these items prior to August 1, 1904, although they were, of course, principally incurred before that time. In so far as these undistributed elements arise in connection with the present cost to reproduce this property, I have not thought it necessary to make a finding as to any of them; and in so far as they arise in connection with the complainant's present aggregate investment, I have declined to make any finding assigning to them a value in excess of the item representing their cost to the complainant and its predecessors, viz. $390,380.86, in which they are included to an extent deemed adequate for the purposes of this case.

*No Reduction for "Accrued Theoretical Depreciation."*—In determining that the complainant's property has a fair present value of at least the amount of

the complainant's actual investment therein as found by me, viz. at least $1,655,877.94, I have made no deduction for what is termed "depreciation," in whatever way calculated. Under any basis of determining present value, the complainant's property is now worth at least the amount of such investment therein, and the sound rule of law and policy seems to require the allowance of a reasonable return upon at least that sum.

Upon the present trial, it was insistently urged upon me by some of the defendants that there should be deducted from the cost of the property (irrespective of whether "original," "pre-war," or "present reproduction" cost be under consideration) an amount claimed to represent so-called "accrued theoretical depreciation," based upon an assumption of "life expectancy" for a gas plant and equipment and the estimated or known number of years since the same was erected or installed. From the testimony given upon the trial, I was strongly impressed that, in respect of a very large proportion of gas property, there is no ascertainable "life expectancy." The withdrawal of such property from service comes about from inadequacy or obsolescence, which cannot be forecast in terms of years or even satisfactorily guessed at. Certain parts of operating machinery and equipment are of course subject to the effects of use. The replacement of these wearing parts enters into the cost of repairs. As to the substantial units of structures, apparatus, mains, and equipment, their withdrawal from the property accounts comes about from causes not attributable to the condition of the property itself, or any diminution in its operating efficiency, but varying utterly with the particular plant, time, local conditions, and service demands, and hence capable of being forecast only as the occasion for such change in plant or equipment becomes imminent.

*The Renewal and Replacement of Gas Property.*—In other words, in order to keep abreast of improvements in the art of making and distributing gas when and as it becomes economically advantageous to do so, and to meet the growing demand of the public for service more adequately and economically than would be possible through merely making additions and extensions to existing plant and equipment, larger or better and more economical and efficient units of plant and equipment are from time to time installed, to take the place of units which are still operating as efficiently as when first installed. The loss due to such supersession cannot properly be said to have accrued during the period the superseded unit was in service. It occurred when supersession took place. It became a proper charge against the economies to be realized therefrom. It furnished no basis for the imposition of an additional charge against the user of the superseded unit during the period of its useful service, over and above the higher cost of operating it. Such a charge could not be justified, either on the ground that the unit was losing potential life, or that the capital invested in it was being consumed, because neither is true.

*Additional Burden on the Consumer Unwarranted.*—In order to justify the deduction of "theoretical depreciation," I was asked in this case to assume that a "depreciation reserve" equal to the computed "theoretical depreciation" had been collected from the public, and then to deduct from the company's investment the amount of such assumed reserve. No such reserve had, in fact, been collected or accumulated by this company. The rate chargeable did not permit it, and there is no reason to believe that the Legislature, in prescribing the rate, ever contemplated it. As I have set forth in findings Nos. 32 and 27 of my report, and as I have elsewhere indicated herein, the complainant gas company has maintained its property and investment intact in the past, through renewals and replacements, at an average actual cost of approximately 3 cents per 1,000 cubic feet of gas sold, and no reason appears for believing that it cannot continue to do so on that basis. Even assuming that the statute permitted such a rate, to have imposed on the company's consumers an additional burden nearly twice as great, representing a purely theoretical item of operating cost, merely to accumulate a useless reserve to justify a drastic deduction from investment in some ultimate proceeding as to rates, could not have been justified on any sound theory in the past, and cannot now be sustained as to the future.

*Effects of an Unnecessary Reserve.*—In order to justify the assumption that a "depreciation reserve" was or should have been collected, defendants' witness Hine testified in this case that such a reserve was necessary, "so that when the property is retired for any cause whatsoever the fund can be charged with the cost of the property." He testified, also, that the reserve should be in his opinion "invested in the property," and that when the funds were needed for renewals and replacements they would be provided "by issuing securities against construction work which had been done originally out of this fund, for the money laid aside for this fund, just to reimburse the treasury on account of these expenditures." This view seemed to me to disregard the obvious fact that, having deducted the amount of the reserve temporarily invested in property from that on which he proposed the company should be allowed to earn a return, he, to all intents and purposes, destroyed the earning power of such property and investment; that therefore he could not issue any securities against such property, there being no earnings therefrom with which to pay interest on the securities; that the reserve could never thereafter be availed of for the purpose for which it was alleged to have been created; and that it would be, in fact, as if it had never been created. Thus he not only failed to sustain his contention that a "depreciation reserve" was necessary for the purposes which he alleged, but he proposed to treat the reserve as if he himself believed it to be both unnecessary and ineffectual, except for the purpose of justifying a deduction from the complainant's investment.

It is obvious that the collection of an unnecessary reserve and its periodic deduction from the value of the property in service would operate to effect a piecemeal purchase, on the part of the public, of the property used by the utility in its service. In other words, it is really asking the consumer to pay for the plant, instead of paying a return on the investment. If such a consummation is desirable, of which there is no evidence, it should be effected openly, and not surreptitiously, under the guise of providing for so-called "theoretical depreciation."

*Present Condition of the Property.*—Mr. Miller testified that, as of April, 1920, the expenditure of $6,144.07 for repairs, renewals, and replacements, would put the plant, structures, machinery, and equipment in condition substantially as good as when they were erected or installed. His testimony in this respect was not contradicted by that of any witness. This sum, however, does not, in my opinion, measure any impairment in the present value of the property used and useful in the gas business. It represents merely an unmatured obligation to maintain the property in efficient operating condition out of future earnings; the expert witnesses of both the complainant and the defendants agreeing that it was and is maintained in efficient and first-class condition. I therefore have not deducted this or any other sum representing so-called "accrued depreciation" from the amount found by me to represent the investment of the complainant in its gas property upon which it is entitled to have its rate such as to yield a reasonable return.

Shearman & Sterling, of New York City (John A. Garver, William L. Ransom, Charles A. Vilas, and Jacob H. Goetz, all of New York City, of counsel), for plaintiff.

Charles D. Newton, Atty. Gen. (Wilber W. Chambers, Charles J. Tobin, and Clarence C. Cummings, Deputy Attys. Gen., of counsel), for defendant Attorney General.

Terence Farley, of New York City (Ely Neumann and Edward M. Deegan, both of New York City, of counsel), for defendant Public Service Commission.

MAYER, District Judge. The bill prays for a decree which shall declare confiscatory, and therefore unconstitutional, so much of chapter 125 of Laws of New York of 1906 as prohibits the charging of

more than $1 per 1,000 cubic feet of gas sold, for gas furnished to the inhabitants of the Third ward of the borough of Queens, commonly known as Flushing and its environs.

As a necessary accompaniment, the bill further prays that defendant public authorities shall be enjoined from enforcing the rate prescribed by the statute. The special master has submitted a full report, dealing, as he was requested and as he properly should, with the various questions of fact and law presented for his consideration, so that the court should be advised in respect of any question which it might deem necessary for decision.

[1] At the outset, however, it is desirable to make clear that this court is not a rate-making body, and that, on final decree, the question on the pleadings and the proof is whether the statutory rate is confiscatory, and therefore whether the defendant public officers should be enjoined from enforcing it. Questions which might be pertinent, where it is sought to fix a rate which shall be as nearly accurate as possible, may prove academic in a case where the basic question is the constitutionality of the statute prescribing the rate.

It is, of course, elementary that a court approaches the consideration of a case of this kind with an attitude of cautious inquiry, always mindful of certain fundamental canons of construction; e. g., the presumption of constitutionality, the conviction beyond a fair doubt that the statute is unconstitutional, and the like. In that spirit of caution, the court may eliminate for the purposes of the case some contentions which might be successfully pressed in a rate case pure and simple. The subject is delicate, in the sense that it affects a large number of persons, who, if possible, should be led to understand that the result which may place a heavier burden on them is just, and that, after making every fair allowance, it nevertheless appears that there is no escape from relieving a public utility corporation from the operation of a statute which has become unconstitutional by reason of conditions and facts never contemplated nor susceptible of prophecy 14 years ago.

During those 14 years the definite trend of legislation, national and state, has been in the direction of regulation by responsible public agencies. The necessity of thus dealing with the subject has been accentuated by the unexpected and radical economic changes due to the war. But, in addition, there are constant changes, which no one can safely predict. It will suffice to illustrate with the price of oil. Increased demand for oil for use in industries, and purposes not realized in 1904, has been perhaps the greatest factor in enhancing its price. No change in this regard seems to be in sight.

These plain conclusions, based on experience simple to understand, point to the desirability of confining a court decision within the limits of the relief asked for in the bill, leaving to the Legislature the task of providing the machinery whereby rates may be flexible, and may be made higher or lower from time to time, as facts and conditions may warrant. Examining, then, this record and the special master's report, it is apparent that discussion is necessary only in respect of the more important features. Many of the details have been carefully and

correctly disposed of by the master in his comprehensive report, which fully, though concisely, has dealt with the essential features of the testimony. Repetition, in this opinion, of certain findings and of the reasons in support thereof is not requisite, and it is enough to indicate approval of those findings.

[2] 1. The year 1919 is in this case "a sufficient basis for the calculation of the cost of production and the 'rate base' for a future long enough to call for some judicial action." Municipal Gas Co. v. Public Service Commission, 225 N. Y. 89, 121 N. E. 772; Consolidated Gas Co. of New York v. Newton et al. (D. C.) 267 Fed. 231; Kings County Lighting Co. v. Nixon et al., 268 Fed. 143. The opinions of Judge Cardozo, Judge Learned Hand, and Judge Hough, in the cases just cited, fully set forth the reasons for this conclusion, and with those reasons on this point I am in full accord.

[3] 2. *The Admissibility of the Books of Account.*—This subject is fully dealt with in the opinions of Judge Learned Hand and of Judge Hough, in the cases supra. Common-law proof of each and every of the thousands of items of the plaintiff's books of account would result in a practical denial of justice. The defendants had full facility to examine into and test the accuracy of the books. Capable cross-examination rarely fails to disclose errors, omissions, and inaccuracies, and injustice is rarely done in a case like this, where there has been such full opportunity for examination.

3. The first inquiry is as to the cost of production of gas; the second, as to cost of distribution. If the cost of production and distribution exceeds the statutory rate, that is the end of the case.

*The Cost of Production.*—Some attack has been made in respect of the cost of oil. An examination of the record shows clearly that the oil accounts were carefully kept and checked. Most of the slight errors during the course of a month were corrected, and the most generous acceptance of the contentions of the defendants would result in a variance of a few gallons, which, translated into money, would be equivalent to a fraction so negligible as to amount to an infinitesimal part of a mill.

The cost of other materials and of labor is attacked, not on the basis of evidence adduced, but, as it were, on general principles. The suggestion is that certain increased costs are suspicious. Yet there is nothing suspicious in the testimony, and it is a matter of common knowledge that during the year 1919 the cost of materials such as are here concerned, and of labor, rose materially in this and other industries. An examination of the testimony, including the exhibits, leads readily to the conclusion that the special master was right in his figures. It was made entirely plain that these costs, in the main, were greater in the first five months of 1920 than in 1919. The point of the inquiry in respect of 1920 was to ascertain whether there was any likelihood that the cost of 1919 had decreased, or would decrease, and no such hope was realized.

4. *Unaccounted-for Gas.*—There is, however, one item which, by way of extra caution, should be reduced. The "unaccounted-for" gas, so called, for 1919, was 11.03 per cent. This percentage varies.

269 F.—19

Some years it may be more; others, less. Therefore the estimate of an expert like Mr. Woods is valuable. This plant, in his opinion, should show a loss of about 10 per cent., and I accept that figure, for the purposes of this case, instead of 11.03 per cent.

In his finding No. 25, the master found that "during the year 1919 this cost of water gas manufacture was 71.73 cents per 1,000 cubic feet of gas sold." This figure was made up of 63.45 cents for cost of production, plus 8.28 cents, cost attributable to loss by way of "unaccounted-for" gas. My figure of 10 per cent., instead of the master's 11.03 per cent., changes the 8.28 cents to 7.45 cents. Therefore the total as found by me, under this head, is 70.9 cents, instead of the master's figure of 71.73 cents.

[4] 5. *Cost of Distribution.*—(a) *Defensive Emergency Service.*— The master excluded this item. In my opinion, he is right. See, also, Judge Learned Hand's opinion in the Consolidated Gas Case, supra.

[5] (b) *Expenses of Litigation.*—These were also excluded by the master, but were allowed by the court in the Consolidated Gas Case. I should follow the decision on this point in the Consolidated Gas Case, were it not that I am firm in the conviction that, while this item may properly be considered in fixing a rate, it is not to be included in determining whether the rate is confiscatory. I agree with the master, both in this conclusion and his reasons therefor.

[6] (c) *Interest on Unpaid Taxes.*—I am of the opinion that this is not a proper charge in this case under the head of cost of distribution and other expenses, and I have excluded it.

[7] (d) *The federal tax on bondholders' income* should not be charged as an expense; nor was it included by the master.

(e) Whether or not the amount of income from insurance participation should be charged as an expense is a debatable question, and for the purposes solely of this decision I have resolved the doubt in favor of the defendants.

(f) The items (c) and (e) figure out 0.09 cents; i. e. $^9/_{100}$ of one cent. The total cost of distribution and other expenses, as worked out on Mr. Teele's sheet, was 32 cents. From this total must be deducted an aggregate of 4.93 cents. This last figure is made up as follows: 0.09 for the two items (c) and (e); 0.22 for item (a); and 4.62 for item (b). Added together, the total of these is 4.93 cents. Deducting, then, from 32 cents, the sum of 4.93 cents, leaves, under the heading of cost of distribution and other expenses, 27.07 cents. Add to this the item for replacement of 3 cents, and for taxes 7.07 cents, and the total is 37.14 cents.

6. If then the 70.9 cents and 37.14 cents be added together, expressed in dollars, the total is $1.0804, instead of $1.0880, as found by the master in finding No. 30. Deducting from $1.0804 the figure of .0675 (for miscellaneous operating revenue as found in finding No. 30), the net cost of gas delivered to the consumer in 1919 was $1.0129. In other words, after making the various allowances, supra, in favor of defendants, to an extent greater than found by the master, it appears that in 1919 the net cost of gas delivered to the consumer was

approximately 1.29 cents in excess of the rate of $1 provided for by the statute. In arriving at this figure it will be appreciated that I have stripped the constituent items down to their lowest minimum.

[8-10] 7. If the figure of 99.51 cents, representing the average selling price of gas, be taken, then the deficiency is 1.78 cents per 1,000 cubic feet of gas delivered. The figure of 99.51 cents results from the fact that under the statute plaintiff is required to deliver gas to the city of New York as a municipality at the rate of 75 cents. This rate has not been attacked by suit. The city in its corporate capacity is entitled to have gas furnished to it at a lesser rate than the private consumer. This fact, however, does not afford any reason why the private consumer should make up the deficiency caused by the lower rate of 75 cents to which the city of New York is entitled. In other words, the fact that the average selling price of plaintiff's gas is 99.51 cents is irrelevant to the ultimate question in the case. In determining whether the statute is confiscatory, the inquiry must start with the proposition that plaintiff under the statute may charge the private consumer (as distinguished from the municipality) $1, and then the question is whether the cost of production and distribution is in excess of that $1.

8. It having appeared, supra, that the cost of production and distribution in 1919 was in excess of the statutory rate, even though to a slight extent, and that conditions in the early months of 1920 showed no prospect for a lesser cost, but, on the contrary, indicated increased cost, it makes little difference what elements are included or eliminated from the rate base, or what theories shall obtain in respect thereof. If every debatable figure and question involved in the rate base were resolved in favor of defendants, plaintiff, under the statute, would still fail to receive the return to which it is entitled. For the purposes of this case, it does not make any difference whether the correct rule is reproduction value, with or without so-called theoretical depreciation, or actual cost, with or without theoretical depreciation; nor does it make any difference whether the rate of return shall be 6, 7, or 8 per cent. Any expression of opinion which goes beyond the requirements of the case would be mere dictum, and in the circumstances would announce little more than an individual opinion. Besides, these questions of reproduction value, actual cost, and theoretical depreciation, and the like, are as much, and perhaps more, in the nature of economic questions than questions of law, and there is no need of discussing them, when their determination is not required for the purposes of the case.

For the reasons outlined, plaintiff is entitled to be relieved from the operation of the statute, so far as it requires the furnishing of gas at the $1 rate to private consumers.