## VINCENNES WATER SUPPLY CO. v. PUBLIC SERVICE COMMISSION OF INDIANA et al.*

Circuit Court of Appeals, Seventh Circuit.
April 17, 1929.

Rehearing Denied May 14, 1929. Supplemental Opinion September 4, 1929.

No. 4113.

*Certiorari denied 50 S. Ct. 26, 74 L. Ed. ——.

Clyde H. Jones, of Indianapolis, Ind., for appellant.

Samuel R. Artman and Arthur L. Gillion, both of Indianapolis, Ind., for appellees.

Before PAGE and ANDERSON, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge. On July 19, 1927, appellant, a public utility, located at Vincennes, Ind., petitioned the Public Service Commission of Indiana for authority to institute a schedule of increased rates, alleging that the fair value of its property was $1,500,000. The Commission refused to approve the relief prayed but ordered placed in effect as of May 1, 1928, a schedule based upon a rate base valuation of $725,000. Immediately thereafter appellant filed its bill of complaint in the District Court alleging that the fair value of its property is not less than $1,400,000; that for its rates to be fixed upon a valuation of $725,000 amounts to the taking of its property without due process of law. Appellees filed answers joining issue upon these allegations. Upon hearing the court dismissed the bill for want of equity.

The basic question with which this court is concerned is whether the valuation fixed upon the appellant's property for rate purposes is so low that the resulting rates fixed by the Commission will amount to confiscation. "Judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use." San Diego Land & Town Co. v. National City, 174 U. S. 739, 754, 19 S. Ct. 804, 810 (43 L. Ed. 1154).

In determining the value the Commission apparently adopted the estimate of its then engineer, Earl Carter, made about September 1, 1927, of the cost to reproduce the property as depreciated of that date, adding to such estimate $54,089 for going value, $6,000 for cash working capital in addition to material on hand and including certain property classed by Carter as not used in normal operation.

At the outset two obvious errors in Mr. Carter's estimate and in the Commission's order should be observed. In arriving at his estimate Mr. Carter deducted the sum of $18,328 from the cost of reproduction of the transmission and distribution system because of the presence of that amount of money deposited with appellant by the owners of real estate for whose benefit surface lines had been laid and installed before the property owners began to consume water. These deposits must be returned to the individual depositors as they later become users. Clearly deposits of such character are a liability, not an asset, and no part of invested capital, and should have received no consideration whatsoever in determining the value of appellant's property.

Furthermore, Mr. Carter's estimate was of September 1, 1927, and the Commission's order accepted his figures as of that date. Between that time and May 1, 1928, when the order became effective, additions and betterments were added to the plant of appellant amounting in the aggregate to $33,830.10. Clearly this became a part of appellant's property which should have been taken into consideration in determining a rate base valuation effective May 1, 1928.

Various witnesses testified and there was before the court evidence upon substantially all facts proper to be considered in determining a proper rate basis. That basis is admittedly the value of the property as of the time of the order. There was evidence as to the original cost of the property, cost of reproduction, historical cost, present day value of construction units, present cash value, and reproduction cost depreciated as of the date of the order. In addition, the appellee offered returns for tax assessments and prior orders of the Commission fixing rates at prior dates. Clearly the latter evidence, if at all competent, is of no material weight in determining the facts. Values determined in former years will not aid in determining present values. Furthermore, the valuation of 1921 introduced by the appellant was clearly based upon a prior valuation determined in 1914. Yet there is no evidence as to appreciation of costs or of the decrease in the purchasing price of a dollar since said dates. It is common knowledge that such appreciation since 1914 has been tremendous. Then, too, if the tax assessment schedule is admissible as an admission of the appellant, it is sufficient to say it cannot furnish a safe guide for determining the rate base value, for too many elements enter into an assessment for real estate taxation which have no place in the determination of the value of property.

Appellees contend that the price paid for stock of appellant at private sale furnishes an adequate test of the value of the property. The stock is quoted upon no exchange, and the only purchases shown in the

record were at private sale prior to filing the application. The language of the Utah Public Utilities Commission in the case of Re J. H. Perry, Public Utilities Reports 1925E, 161, at 185, is pertinent in this connection: "Such questions as capitalization and the amount and kind of securities and the market value of the same, can have, in any event, only remote evidential value. In many instances, capitalization bears no particular relation to invested or present value, and the market price of securities depends upon the rates charged for service. If rates are lowered by regulatory bodies, the market value of securities will fall. If rates are raised, within reasonable limits, the value of securities will rise. As pointed out by some commissions, to determine the value of a public utility for rate-making purposes, the using of the market value for securities to make such determination, would involve reasoning in a circle. It is usually now held to be not a legal basis for determining present value, as is pointed out in the case of Monroe Gaslight & Fuel Co. v. Michigan Pub. Utilities Com. (D. C.) 292 F. 139, at 150."

If the purchaser paid too much for his stock, the public should not as a result be imposed upon by rates to fix a reasonable return upon such purchase price. If the purchaser paid too little, he is entitled to the benefit of his bargain. To determine value from the purchase price of stock at private sales is, as indicated above, to reason in a circle, for if rates charged be unreasonably low, the value of the property upon that basis is depressed; if unusually high, it is inflated. The test always is the present fair value of the property. As the Supreme Court says in the case of McCardle v. Indianapolis Water Co., 272 U. S. 400, at page 410, 47 S. Ct. 144, 148 (71 L. Ed. 316): "It is well established that values of utility properties fluctuate, and that owners must bear the decline and are entitled to the increase."

█ Various witnesses testified as to the cost of reproduction less depreciation. The appraisement compiled by Carter was, as we have said, substantially adopted by the Commission. His estimate of—

| | |
|---|---|
| The reproduction cost of all of the property, including that which he said was not used in normal operation, but which was included by the Commission, less only the land, was...................... | $830,087 00 |
| If we add to this the two items omitted by obvious errors, deposits of.......... | 18,328 00 |
| And additions and betterments after August 1, and prior to April 30, 1928, of... | 33,830 00 |

We find that his testimony as to the cost of reproduction of the tangible property of appellant, except the real estate, is.. $882,245 00

From this he made a deduction of approximately 27 per cent. for depreciation, and added 15 per cent. for organization and construction expenses. Wenger, chief engineer of the Commission, succeeding Carter, testified that the cost of reproduction of the tangible property, other than the real estate, was $778,769. To this he added approximately $211,000 for construction costs. He estimated that these figures should be depreciated 27 per cent. Wenger allowed nothing for going value. Carter testified that the going value allowed by the Commission of $54,089 was approximately correct. Stone & Webster appraised the cost of reproduction of the tangible property, less the real estate, at $964,265, and estimated the depreciation at approximately $60,000. To this was added incidental costs of $143,000 and organization expenses, including items as follows: Organization $50,000; cost of financing $65,000; and the further item of working capital $22,000, and going value $136,000. Mr. Alexander, general manager and stockholder of the appellant, placed a figure of $1,163,719 upon the reproduction cost of the tangible property. The depreciated value he estimated at $1,159,730. He added expenses of construction and organization, which brought the total of reproduction, less real estate, to $1,467,810. Mr. Gilbert, engineer for the city of Vincennes, testified as to the condition and present value of various parts of the plant. Mr. Brosman, consulting engineer, testified as to the condition and value of certain items and placed an estimate upon the cost of reproduction of various units. Some eight witnesses testified as to the value of the real estate, and a fair conclusion of all of their testimony is that the value of the real estate is, at least, $16,000; perhaps somewhat in excess of that.

After considering all of the evidence bearing upon value, the interests of the respective witnesses and the condition of the property, and the testimony to the effect that the plant is well constructed, equipped, and managed, we have reached certain convictions that seem to us inescapable upon this record. Considering all of the evidence offered as to the cash value of the property, it appears that—

| | |
|---|---|
| the fair value of the tangible property, less the real estate, is................. | $ 800,422 00 |
| that the land is fairly of the value of.. | 16,000 00 |
| and that the costs of construction and intangible items, proper to be allowed, aggregate ...................................... | 215,642 00 |

| | |
|---|---|
| Therefore the value of the entire property to be considered, as a rate-making basis, is ................................. | $1,032,064 00 |

The costs of construction, properly allowed, deducible from all of the testimony upon the subject, consist of the following items:

| | |
|---|---|
| Engineering costs | $ 35,000 00 |
| Taxes during construction | 16,000 00 |
| Interest during construction | 50,000 00 |
| Miscellaneous costs of construction, including supervision and contingencies | 18,000 00 |
| Legal expenses | 5,000 00 |
| If we add to these items a going value of 10 per cent. of the value of the tangible property of | 81,642 00 |
| and a working capital of cash in addition to the materials on hand of | 10,000 00 |
| We have a total of | $215,642 00 |

as the fair value of these items to be added to the value of the tangible property and the real estate.

█ It is unnecessary to discuss all of the testimony with regard to the value of the tangible property. If we analyze Mr. Carter's estimate of reproduction, less depreciation, adopted by the Commission and correct the errors made, we find that his valuation of tangible property corrected as above is $882,245. If we depreciate this by $136,747, we have a net cost of reproduction, less depreciation, of $745,498. If we add to this the value of the land as $16,000 and $215,000 for tangible assets and costs of construction and working capital, we have a total of approximately $976,000. If, instead of adopting the figure of $215,000 for going value, general costs, and intangible items, we use his calculation of 15 per cent. for costs of construction, and his item for going value, the total is not greatly less. On the other hand, Stone & Webster's estimate of the cost of reproduction, less expenses, would be reduced to approximately $1,050,000; Alexander's estimate of cost of reproduction, less depreciation, to $1,214,000; and Mr. Wenger's estimate to $937,000. It is evident that the value placed by us upon the tangibles is not far from the mean of the estimate of all of the engineers of the cost of reproduction, less depreciation, provided the depreciation which we suggest is a reasonable one. Stone & Webster and Alexander estimated a depreciation of approximately 4 per cent.; Wenger and Carter estimated the depreciation at approximately 27 per cent., but it should be observed in this respect that Mr. Alexander was directly interested as a substantial stockholder. On the other hand, neither Carter nor Wenger ever saw any of the mains or any of the meters, except some in the office building, which were not examined. They did not examine the inside of any of the equipment, or any of the mains in use, or any of the surface pipes. Mr. Wenger

testified that he was not interested in opening any of the pipes and taking out sections. "Opinion evidence, to be of any value, should be based either upon admitted facts or upon facts, within the knowledge of the witness, disclosed in the record. Opinion evidence that does not appear to be based upon disclosed facts is of little or no value." Balaban & Katz Corp. v. Commissioner of Internal Revenue (C. C. A.) 30 F.(2d) 807.

After considering all evidence as to value and as to cost of reproduction and depreciation, we have concluded that in determining cost of reproduction less depreciation, the mean average depreciation used by the four engineers is equitable; not upon a straight or curved line theory of depreciation, but as the actual quotient of all of the testimony as to depreciation. Accepting this result and applying it to the testimony of the four engineers, we find that the result is not far distant from the value which we have deduced from all the testimony. The items as to engineering costs, taxes, interest and interest during construction, legal expenses, and miscellaneous expenses are amply justified by the testimony of the various engineers.

█ There can be no question as to the necessity of working capital in the management of any enterprise. It furnishes the means by which business is transacted. It meets the pay roll and the current bills for materials and other running expenses. A capital fund for these purposes, present from day to day in amounts adequate for the reasonable needs of the company, must be supplied. It should be an amount such as reasonable business men, experienced, would require in the conduct of this kind of business, and we find in various cases allowances of from three to 8 per cent. for that amount. The Commission allowed $6,000 for this item. In our opinion, considering the value of the property, its transactions, its pay rolls, and its service to the public, this sum should not be less than $10,000, which is the operating expense for less than two months. The materials on hand, which approximate $11,000, with the additional cash of $10,000, should furnish a fairly adequate working capital.

In McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316, the court said: "The decisions of this court declare: 'That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right

to make a fair return when the same is privately owned although dedicated to public use.'" This going value has been fixed by various other courts at rates ranging from 10 to 25 per cent. of the value of the tangible properties. In our opinion the facts in this case indicate, as they did in the case of McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316, that 10 per cent. of the value of the physical elements is low.

Appellant contends there should be included in the valuation an item of $65,000 for cost of financing, and, while there may be circumstances under which consideration of such an item is proper, there is no fact in this record that would establish the propriety of such inclusion. It has not been shown that there has been any expense in the financing, and if there has been none, none should be included.

We have endeavored with all of the care possible to ascertain the actual value of appellant's property. Bearing in mind that this court is interested only in determining whether or not the rates fixed will work a confiscation; keeping in mind further that appellant is engaged in a quasi public business where it is serving the people, and that the people are entitled to such service for such compensation as is fair and reasonable, considering the appellant's constitutional rights—we are of the conviction that the value upon which rates shall be fixed, including all proper items to be considered, and excluding the items not proper to be considered, is the sum of $1,032,064, and that there should be a decree against the Commission enjoining it from ordering any rates which will produce less than a proper return to the appellant. The parties have stipulated as to a proper rate, and the stipulation is in accord with the decision of the Supreme Court as to what is a proper return upon public utility properties. In order to determine what rates will furnish this stipulated amount, it will be necessary for the court to consider the income from the property in the past and at the present and the probable income in the immediate future, whereupon it will be necessary to enjoin the Commission from entering any order as to rates and schedules that will furnish a return less than that stipulated by the parties upon the valuation found by this court.

The decree of the lower court is reversed,

at the cost of appellees, with directions to proceed in conformity with this opinion.

### Supplemental Opinion.

It may be that the language of the two concluding paragraphs of the opinion above is susceptible of an interpretation, which the court did not intend, to the effect that we have attempted to enjoin future acts by the commission, the validity of which was not before us, and to bind it in its legislative actions to recognize the stipulation of the parties. Such was not the intent of the court. Rather we found the value of the property to be $1,032,064, the enforcement of the schedule of rates heretofore ordered by the commission to amount to an unconstitutional confiscation of plaintiff's property, and the rate of proper return to plaintiff, as stipulated by the parties, to be in accordance with the Supreme Court's utterances in previous similar cases.

The Supreme Court in New Orleans Waterworks Co. v. New Orleans, 164 U. S. 471, 17 S. Ct. 161, 41 L. Ed. 518, expounds the doctrine that equity cannot interfere with, or in advance restrain, the discretion of a municipal body's exercise of legislative powers. The Public Service Commission is an arm of the Legislature included within the classification of such municipalities. So in McChord v. Louisville & Nashville R. R. Co., 183 U. S. 496, 22 S. Ct. 165, 46 L. Ed. 289, the court held that railroad companies may not be granted an injunction against the state Railroad Commission before rates are fixed. In Chicago, etc., R. Co. v. Winnett, 162 F. 247, 89 C. C. A. 222, and Southern Pac. Co. v. Bartine (C. C.) 170 F. 775, the courts held that equity would not enjoin in advance fixing of rates by Railroad Commission.

It is the intent of this court that, though the commission, acting in its legislative function, must keep in mind the proper return upon utility properties, in order to prevent confiscation as heretofore determined by the Supreme Court, the injunction to issue shall not attempt in any wise to control the legislative functions of the commission in the future, but will enjoin that body only from an enforcement of the schedules of rates complained of. Whether any rates hereafter to be established by the commission are confiscatory is a question not now before the court.