## CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed May 10, 1928.

THE UNITED RAILWAYS AND ELECTRIC COMPANY OF BALTIMORE

VS.

HAROLD E. WEST, CHAIRMAN, AND J. FRANK HARPER AND STEUART PURCELL, MEMBERS, CONSTITUTING THE PUBLIC SERVICE COMMISSION OF MARYLAND.

*Henry H. Waters, Venable, Baetjer & Howard, Haman, Cook, Chesnut & Markell* and *Joseph C. France* for United Railways & Electric Company.

*Thomas J. Tingley* and *Raymond S. Williams* for Public Service Commission.

*Carville D. Benson* and *James K. Cullen* for people of Halethorpe.

*Linwood L. Clark* for People's Corporation.

*William A. Toole* for State Committee of The Socalist Party of Maryland.

ULMAN, J.—

Four questions are presented for judicial review in this case, viz:

I.—The Commission's order limits company's rates to yield 6.26 per cent. on value of company's property. Is this unreasonable and/or confiscatory?

II.—Commission's order permits to the company $883,544 as an annual allowance to provide for depreciation and retirement of company's property. Company claims that a proper annual allowance for such purposes would be $2,200,000. Is the action of the Commission in this respect unlawful?

III.—In determining the present value of company's property to be $75,000,000 the Commission made no allowance for net additions since its valuation as of January 1, 1924. Was this action of the Commission unlawful?

IV.—Was the order of the Commission in abolishing the second fare to Halethorpe unlawful?

### Jurisdiction of This Court and Its Powers of Review.

The parties to this proceeding seem to be in substantial accord as to the scope of judicial power in this proceeding. "The power of the Commission to fix reasonable rates is legislative, the functions of the Court in reviewing the actions of the Commission are distinctly judicial and are exercised only for the purpose of determining whether such actions of the Commission is unreasonable or unlawful." "Under an application to the Court for an injunction restraining the exercising of an order of the Commission, the Court has no authority to determine what would be a reasonable rate for the service required, or to establish rates, but its power is limited to the determination of the question whether the rates fixed by the Commission are unreasonable or unlawful, and until it is made to appear by clear and satisfactory evidence that the action of the Commission is unreasonable or unlawful, the Court is without power to impose any restriction upon the execution of the Commission's order." The order of the Commission "is a legislative mandate which is reinforced by the fact that the Commission is a tribunal erected by law, informed by experience and assisted by a trained corps of subordinates."

Public Service Commission vs. Northern Central R. R., 122 Md. 355; Havre de Grace Bridge Company vs. Public Service Commission, 123 Md. 16; West vs. Byron, 153 Md. —, 138 Atlantic Rep. 404.

In spite of the vast number of judicial opinions which have been handed down since 1898, the fundamental rule in rate cases as expressed by the Supreme Court of the United States in that year in the case of Smyth vs. Ames, 169 U. S. 466, has never been changed. It is that "What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience." * * * And that "What the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered * * * are reasonably worth."

### Introduction to Consideration of the Four Questions Involved in This Case.

Questions I and II above are so inextricably bound together that logical treatment demands that Question II be considered first.

If company is entitled to set apart any portion of its earnings for the creation of a depreciation reserve, it necessarily follows that the amount of such earnings remaining as return on value will be greater or less as the amount so set apart for depreciation reserve is less or greater. To illustrate, company claims the right to set apart for depreciation reserve $2,200,000 per annum. Commission has determined that a reasonable allowance for depreciation reserve is $883,544. The difference between these two sums, $1,316,456, amounts to 1.75 per cent. on the value of company's property or rate base. Commission has decided that company is entitled to earn 6.26 per cent. on said rate base; and has calculated that company will do so by charging the fares fixed by Commission. But that calculation includes the aforesaid allowance of $883,544 for depreciation. If, for that figure, there should be substituted company's claim of $2,200,000 the percentage of return on rate base would be 6.26 per cent. minus 1.75 per cent., or 4.51 per cent. See opinion of Commission, page 37. On the other hand, company, in its Exhibit No 24, shows that a ten cent fare would yield a return at the rate of 7.44 per cent. on said rate base. But that computation includes an allowance of $2,200,000 for depreciation. Manifestly, if there should be substituted Commission's depreciation figure of $883,544 the resultant return would be 7.44 per cent. plus 1.75 per cent., or 9.19 per cent.

Therefore, before it is possible to determine what percentage of return will result from any given rate of fare, it is necessary to decide the amount of a legally proper depreciation reserve.

### QUESTION II.

*Was the Action of Commission in Fixing Depreciation Reserve at $883,544 Lawful?*

#### A.

It is conceded that the setting aside of a proper amount for depreciation reserve is not only the right of the com-

pany, but that, in the case of a public service corporation at least, it is its duty to its bond and stockholders and to the public.

Knoxville vs. Water Co., 212 U. S. 1, 13-14.

(1) *Should the amount of depreciation reserve be based upon the value of company's property or upon its cost?*

"If the rate base is present fair value, then the depreciation base as to depreciable property is the same thing. There is no principle to sustain a holding that a utility may earn on the present fair value of its property devoted to public service, but that it must accept and the public must pay depreciation on book cost or investment cost, regardless of fair value."

Michigan Public Utility Commission vs. Michigan State Tel. Co., 228 Michigan 653; Minnesota Rate Case, 230 U. S. 352, 454; Brush Electric Co. vs. Galveston, 262 U. S. 443, 445; Georgia Railway vs. Railroad Commission, 262 U. S. 625-633.

It is urged by counsel for Commission that while the language used in the Federal cases above cited may justify the conclusion reached, the precise point now under consideration was not passed upon in those cases. A careful reading of these cases gives some force to that argument. Against it, however, are not only the Michigan case cited, but at least three other cases (one from the highest Court in Kansas) which counsel for Commission have, with commendable frankness, cited on page 81 of their brief. Moreover, the rule as stated, commends itself to reason. We have already seen how intimately blended are rate of return and depreciation reserve. In the instant case, shifting from Commission's allowance to company's claim as to depreciation allowance makes a difference of 1.75 per cent. in rate of return. To this Court it seems inevitable that the same measuring rod, viz., present value of property, should be used as the base for the determination of both of these intimately related and inter-dependent results. In reaching this conclusion the Court is not unmindful of the contrary opinion of the Interstate Commerce Commission in cases No. 14700 and No. 15100 dealing with depreciation charges of telephone and steam railway companies, decided November, 1926. The opinion of the Interstate Commerce Commission in those cases does proceed upon the accounting theory that depreciation reserve should be based upon a percentage of costs or "ledger values." See said opinion, page 375; and it is true, as urged by counsel for the Public Service Commission herein, that the American Telephone and Telegraph Company has so kept its books since 1914: and it is also true that the Public Service Commissions of Missouri, Illinois and Wisconsin have approved this system. Nevertheless, the accounting system so approved by said several commissions does not reflect actual facts. As said by Judge Rose in Chesapeake and Potomac Telephone Co. vs. Whitman, 3 Fed. 938-942, "Books so kept would show the cost of company's property at any particular time. In the absence of great changes in value, such cost, due allowance being made for depreciation, would be a fairly accurate measure for present value." The significance of this quotation, in the opinion of this Court, is that the period involved in the present case is just precisely a period during which there have been great changes in value. Much of the depreciable property of the company involved in the present calculation was acquired prior to the year 1914, at pre-war cost levels. Its value, as determined in the valuation case, as of January 1, 1924 based on post-war price levels, differs so materially from pre-war costs that the use of the accounting or cost system as the rate base for depreciation reserve is, in the opinion of this Court, unreasonable and unlawful.

(2) *The amount allowed for depreciation reserve should be based, so far as it possibly can be, upon objective evidence.*

Havre de Grace Bridge Co. vs. Public Service Commission, 132 Md. 16-32-33; Pacific Gas Company vs. San Francisco, 265 U. S. 403-405-406.

"The testimony of competent valuation engineers who examined the property and made estimates in respect to its condition is to be preferred to mere calculations based on averages and assumed probabilities."

McCardle vs. Indianapolis Company, 272 U. S. 400-417.

*The Commission allowed for depreciation reserve the annual sum of $883,544. This is obtained by taking 5*

*per cent. of assumed gross returns under the rates of fare allowed by it.*

(1) Although this measurement of depreciation reserve by a percentage upon gross returns is a usual accounting practice, it is hard to justify it upon any principle of logic. To this Court, it seems almost totally irrelevant. The Commission recognizes this irrelevance; but justifies its method upon the ground that the result seems to work out "fairly well." *See opinion of Commission, pages* 26-27.

(2) It was conceded during the argument by Company's counsel that if the result did work out "fairly well" then the irrelevancy of the method employed by the Commission in arriving at its result would be no sufficient reason for judicial review of its act—and this concession was made in the face of the language used by the Court of Appeals at the conclusion of its recent opinion in the case of *Electric Public Utilities Co. vs. West et al.*, filed February 15th, 1928, and reported in *The Daily Record* of February 18th, 1928. However, the Commission did more than announce a result founded upon an irrelevant method of calculation. It tested that result by an analysis of the testimony in the case. "Depreciation" is discussed in the opinion of the Commission upon pages 22 to 30, inclusive. That discussion reveals fully the reasons which lead this Court to conclude that the amount fixed by the Commission for depreciation reserve was unlawfully fixed and probably was an unreasonably low amount. The opinion of the Commission shows the use by it of the following improper methods:

(a) It based depreciation reserve upon cost rather than present value. For the reasons stated above in discussion of Question II, paragraph A, 1, the Court disapproves that basis.

(b) It assumed a fixed relationship between the per cent. condition of Company's property and past depreciation, and from this assumption proceeded to determine rate of depreciation. This assumption is fallacious because the per cent. condition takes no account of obsolescence, either ordinary or extraordinary. Certainly proper depreciation reserve should make provision for ordinary obsolescence.

(c) It threw out and practically disregarded the only evidence of competent valuation engineers who examined the property and made estimates of its condition, and based its conclusions instead upon mere calculations based on averages and assumed possibilities. In this the Commission reversed the procedure approved by the Supreme Court of the United States and adverted to above in this opinion under Question II, paragraph A, 2.

## C.
### The Court's Conclusions Regarding Depreciation Reserve.

Upon this question further consideration by the Commission is plainly necessary. What may be called the real evidence, or the affirmative evidence, upon the question, points strongly to the conclusion that the Commission's allowance of $883,544 is inadequate. But in the present state of the record, the Court cannot conclude whether the Company's claim of $2,200,000 is reasonable or is excessive. It is clear that the Commission, in testing its reasonableness, has used a false measuring rod, has made a fallacious assumption of relationship between per cent. condition and depreciation, and has substituted theoretical calculations and assumed probabilities for affirmative evidence not contradicted in the record.

Probably, however, evidence is available which was not brought forward at the original hearing which may justify the Commission in rejecting or in modifying the Company's claim for depreciation reserve. At all events, the Commission should investigate this matter thoroughly and make a new computation. Its own engineers should examine the property physically and should testify as to the physical condition, plus the ordinary obsolescence, plus the "life expectancy" of the several classes of depreciable property, including in such "life expectancy" what they consider a reasonable allowance for accruing ordinary obsolescence. Upon such testimony, along with the like testimony of Company's engineers, the Commission should make a new computation which should be made so as to show the Court that these legal standards have been used in the making of it. When the Commission shall have done this, and, in its usual fair and clear manner shall show that it has done so, its findings will become one of those quasi-judicial "legislative" acts performed by an administrative body to which the Court will give the weight

assigned to it by the Court of Appeals in *West vs. Byron*, 138 Atlantic 404-410.

## QUESTION I.

*Is the Return of 6.26 Per Cent. Allowed by Commission Unlawful?*

### A.

*The Commission has fixed 6.26 per cent. as neither unreasonable nor confiscatory. The Company contends generally for 8 per cent., but bases its specific claim on a calculation showing approximately 7½ per cent. See Company's Exhibit No. 24, opinion of Commission, page 18.*

The authorities show a strong judicial drift towards regarding 8 per cent. as a fair rate of return for regulated public service industries. The Commission disregards this judicial drift on two grounds, viz.:

(1) That the risk of return is greater in the case of an urban street railway company than in those public utilities as to which the Courts have approved an 8 per cent. rate of return; and that therefore a lower rate of return should be granted to an urban street railway company. This is a ground of distinction which may be said to be founded upon a principle—whether a true principle or a false principle will appear below.

(2) That the urban street railway industry as a whole is not and has not been earning an 8 per cent. return. This is a ground of distinction founded not so much upon the assertion of a principle as upon an observation of facts and an assumption of causal relationships respecting them.

### B.

*The Court's Opinion on the Commission's Determination That 6.26 Per Cent. Is a Fair Rate of Return.*

(1) Whether sought to be justified either on the ground just stated in sub-paragraph 1 or in sub-paragraph 2 above, the Commission's determination is subject to an identical infirmity, viz., its assumption that urban street railway properties are in a category by themselves. The Court's opinion is that the true basis of a category is not the specific service rendered,—which might result in one rule for gas companies, another for electric companies, another for water companies, another for a

combination of the above, and still another for street railway companies,—but is that within the category there shall be included all regulated public service corporations performing a necessary service, and subject to similar business risks.

The best illustration of the impropriety of the Commission's theory, which groups urban street railway properties by themselves, is the practice followed by the Supreme Court of the United States in its consideration of a water company case, viz.: McCardle vs. Indianapolis Water Company, 272 U. S. 400-419. Passing upon the constitutional rate of return for a water company, the Supreme Court cited the decisions in ten cases, of which four dealt with gas companies, one with a natural gas company, one with a street railway, three with telephone companies and only one with a water company.

The Commission has not arbitrarily ignored the above theory of classification which this Court suggests; but it cites no authorities for departing from it. This is somewhat strange; even more strange is the Commission's suggestion that this regulated public industry should be placed in a class with jobbers of merchandise. See Commission's opinion, page 21. Although the Commission cites no authorities, its decision plainly proceeds from its acceptance of the principle expressed in that group of cases of which Covington & Lexington Turnpike Road Company vs. Sanford, 164 U. S. 578, decided in 1896, may be regarded as the prototype. That is to say, the Commission assumes that in the case of an urban street railway company it is dealing with a moribund industry of questionable public necessity; and that in the case of such an industry the value of its service to the public must be given a controlling force in the equation which will determine fair rate of return. Unquestionably, the Covington case and those like it, cited by counsel for the Commission on their brief, are authorities for this proposition not only in respect of moribund industries but also in respect of industries which are as yet undeveloped.

Does the urban street railway industry fall within this classification,—is it a moribund industry? This Court thinks not, for the following reasons:

(a) Though the Commission has fixed a rate based on this principle, it has by its findings of fact, expressly negatived its own major promise. The opinion of the Commission under the head "Railway Service a Necessity," pages 7, 8 and 9, is as strong a statement on this question as the Court can conceive.

(b) The evidence shows that the facts sustain the opinion of the Commission that the industry is necessary, and do not sustain its action, which rests upon a contrary assumption. See testimony of C. D. Emmons, Record, page 3282. This evidence, which is not disputed, shows that at the hours of peak load, the Company carries more passengers now than it ever did. Hence it is obvious that the competition of the private automobile, of which so much has been said in the briefs and in argument, has *modified* the need for public transportation in Baltimore, but has not shown a tendency to supplant it. This modification results in an increased cost of service. Necessity of service is as great as it ever was.

(c) The legal principle inherent in the action of the Commission has never been announced in the case of an urban street railway company. The Covington case, supra, dealt with a turnpike road. Counsel for Commission cite in their brief a number of cases adopting the same principle in dealing with interurban electric railways, and one case from the Supreme Court dealing with a small logging railroad. These industries differ in kind from all other forms of regulated public industry, including urban street railways. They really are *moribund* industries,—many of them have died without resultant loss to the communities formerly served by them. The cases cited should be read, therefore, not as statements of abstract law but with reference to their subject matter.

(2) We shall now examine separately the validity of the grounds of distinction relied on by the Commission.

(a) With respect to the Commission's proposition that since the risk of the business is greater in urban street railway cases than in the case of other utilities, their rate of return should be less, it is obvious that the Commission has reached an inverted conclusion, unless the term "risk of

business" is used, and properly used by it, in the sense of describing an undeveloped industry or a business demonstrably moribund and visibly doomed to extinction. The urban street railway business is not *now* so visibly doomed. It may become so, or it may not. But present rate regulation should not proceed upon the prediction that it will. Unreasonably low or confiscatory rates so based certainly would tend to produce consequences which might justify the prediction.

(b) The proposition that the street railway industry is not and has not been earning more than 6.26 per cent., and that hence an allowance of that amount is fair, is by far the most persuasive statement, in a popular sense, which appears in the opinion of the Commission. The Commission elaborates that statement, by saying not only that it *is* so but by suggesting as the reason for its being so that the urban street railway utilities themselves have admitted its inevitableness by not attempting to get rates of fare high enough to prevent its being so. From this the Commission concludes, first, that probably the "traffic will not bear" such rates,—that the "economic limit" of fares has been reached and that present rates are "economic rates" as defined in Re Fishkill Electric Railway Company (N. Y. P. S. C., 2nd Dist.), P. U. R. 1919 D, 1, at page 7 : (see Note below) ; and, secondly, by implication, that the failure of such utilities "to appeal for their rights in court" over a period of years disentitles them now to do so. The Court accepts neither of these propositions.

Note: "A requested increase may apparently be justified because of a lack of reasonable return; and yet the increase asked might, if granted, actually result in a decreased, instead of an increased, revenue. Where a deficiency in revenue must be met, the real problem is to find and fix the rates that will permit the most people to ride and still be high enough to cover costs. These rates may well be called the economic rates. Lesser rates spell bankruptcy; higher rates mean reduced operating revenue and a similar result. When these rates are finally found, they measure the economic demand for trolley service in that community. If the service is more extensive or more expensive than such demand requires, then the system to become and remain solvent must scale sufficient assets or abandon enough of its tracks, or both, to reduce the outgo. The income has reached its limit at that point." Re Fishkill Electric Company (N. Y. P. S. C., 2nd Dist.), P. U. R., 1919 D, I, at page 7.

As to the former, the Court's position will be made clear below under Paragraph C, 3 of this section of this opinion; as to the latter, it is sufficient to cite Bluefield Company vs. Public Service Commission, 262 U. S. 679, 694-695.

## C.

### *What Principles Should Govern in Fixing Rate of Return and What Rate of Return Should Be Allowed?*

While no precise formula has been announced by the courts, and no rate of return applicable equally to all public utility companies can be determined, because each case must rest upon its own circumstances, nevertheless, we return to the general principle announced by the Supreme Court in Smyth vs. Ames, supra, that the rate of return must be fair both to the Company and to the public.

Probably the most significant development of the law in this regard since Smyth vs. Ames, supra, is that the determination of what is fair to the utility company has been decided to rest upon the percentage of return upon the "value of its property used or useful in the public service" quite regardless of the financial structure of the utility company, and equally uncontrolled by the original cost of said property. This development of the law has been gradual; and it is conceivable that the present statement of it may not be final. The decisions of the Supreme Court, upon which this legal proposition is now so firmly founded, are punctuated by vigorous and persuasive dissenting opinions proceeding from the pen of Mr. Justice Brandeis, upholding the conflicting doctrine that rate of return should be calculated upon "prudent investment cost." However, whatever may be the future development of the law, it is well settled, at this time, that rate of return must be calculated upon present value.

### 1. *What is a "fair" rate of return from the point of view of the regulated company?*

In order that the return may be "fair to the Company" it must cover the "cost" of service,—"cost" meaning expenses of operation plus a fair return on the investment. Moreover, a "fair return on the investment" must be such a return as that from which it might reasonably be expected that money will be invested in the enterprise. In the light of the recent authorities, it is thought that this statement is axiomatic. The only exception to its applicability is in the case of those utility companies whose service can not be said to be necessary. We have seen above that the United Railways & Electric Company of Baltimore does not fall within this category.

The propositions of law in this subsection of this opinion are so well settled that it is deemed unnecessary to analyze the authorities upon which they rest. Some of the principal cases are:

Willcox vs. Consolidated Gas Company, 212 U. S. 19; Des Moines Gas Company vs. Des Moines, 238 U. S. 153; Lincoln Gas Company vs. Lincoln, 250 U. S. 256; Bluefield Company vs. Public Service Comm., 262 U. S. 679; Galveston Electric Company vs,. Galveston, 258 U. S. 388; New York Telephone Co. vs. Prendergast, 300 Fed. 822; McCardle vs. Indianapolis Water Co., 272 U. S. 400; Alton Walter Co. vs. Illinois Commerce Comm., 279 Fed. 873.

2. The cases above cited, and many others, might be regarded as abundant authority for the proposition that a public utility such as the company in this case, is subjected to daily confiscation of its property and that the continuation of rates of fare producing a return of less than 8 per cent. on the value of its property amounts to the taking of such property without due process of law in contravention of the 14th Amendment of the Federal Constitution. It is both interesting and significant that in the opinion just handed down by the Federal Statutory Court for the Southern District of New York in the case of Interborough Rapid Transit vs. The Transit Commission while thousands of words are devoted to the consideration of other questions involved in that case, the Court assumes as beyond the sphere of argument that the company is entitled to an 8 per cent. return on the present value of its property, and cites only four cases in support of such assumption, viz.:

McCardle vs. Indianapolis Water Company, 272 U. S. 419; Bluefield vs. Public Service Commission, 262 U. S. 679; Galveston Electric Company vs. Galveston, 258 U. S. 388; Brooklyn Union Gas Company vs. Prendergast, 272 U. S. 580.

Many additional cases sustaining the same proposition have been cited on company's brief. This Court might well conclude that it is established by the authorities that a return of 8 per cent. on present value is the minimum limit for the avoidance of confiscation. For the purpose of the present case, however, it is not necessary to go quite so far. It must be assumed that company has, in this case, stated its position with full regard for what it conceives its right to be. Company's Exhibit No. 24 analyzes what company claims to be the result of a grant of the right to charge a flat ten-cent fare. This exhibit shows that said fare would yield a return of 7.44 per cent.; and company expresses its satisfaction with that rate of return.

It has been well said that no two rate cases are precisely alike. It is also true that prevailing interest rates on bonds, at least, have fallen since many of the cases approving an 8 per cent. return on value were decided. While it is obvious that the price at which money can be obtained as an investment in bonds has no direct relationship with the rate of return upon rate base to which a utility is entitled, nevertheless falling interest rates do bear some relationship to the question of the rate return which a company must earn in order that it may attract capital for investment. It is reasonable to assume that a recognition of this relationship by company plays some part in its expressed opinion that a return of 7.44 per cent. would not be confiscatory.

It is also suggested that the test in a State Court is not merely confiscation but also reasonableness. The Maryland Court of Appeals has recognized this in Pennsylvania Railroad Company vs. Public Service Commission, 126 Md. 59, 76-77. It is conceded that the margin of difference between a confiscatory rate and a rate unreasonably low is not great. Viewing this case in the light of its own circumstances, and giving due weight to Company's Exhibit No. 24, this Court is of the opinion that a rate of fare which would produce a rate of return not exceeding 8 per cent. on value would not be unreasonably high; but that any rate of fare producing a rate of return lower than 7½ per cent. on value certainly is both unreasonably low and confiscatory.

3. *What is a "fair" rate of fare from the point of view of the public?*

Reverting once more to the fundamental principles announced in Smyth vs. Ames, supra, the public is entitled to demand that rates shall not call upon it to pay more than the service rendered are reasonably worth. A fair rate must be fair to the utility and fair to the public. How can the question of fairness to the public be tested?

(a) Manifestly it must be within the "economic limit." Testimony of Professor Jacob H. Hollander, pages 3160 et seq., is regarded by the Court as most persuasive upon the proposition that this "economic limit" would not be exceeded even by the rate of fare sought by the company. At this point, it might be well to add that the Commission, in its finding that the increase of rates of fare from 7 1/2 to 8 1/3 cents may be expected to cause a falling off of only 2 per cent. in patronage, with a substantially large resultant increase of net return, reinforces the opinion of this Court that the "economic limit" of fares is not even being approached. Also, it is reasonable to assume that the enlightened self-interest of the company would prevent it from attempting to secure fares in excess of such "economic limit."

Against this assumption, the Commission in its opinion calls attention to the fact that urban street railway companies generally have not attempted to charge fares as high as those which the company seeks to charge. From this circumstance, the Commission concludes that the management of said companies has been motivated by a recognition of the fact that fares of such magnitude would be subjected to the economic law of diminishing returns. Obviously, that is merely a speculative assumption on the part of the Commission, which has no way of knowing such motives. This Court hesitates to indulge any similar speculative assumptions. Yet it may well be that the reluctance of urban street railway management to push its demands towards or up to the point at which returns would be adequate, as defined in respect of other public utilities, may proceed from the traditional force of the concept of a five-cent fare as being synonymous in the public mind with "carfare" in a quisa generic sense. This is a simple concept, much more

readily grasped than anything analogous to it in connection with telephone rates, gas rates, and the like; and it causes public resentment against each successive increment of increased carfare in a thoroughly illogical manner. Thus, when fares are raised from 7½ to 8 1/3 cents, a large section of the public immediately compares the new fare not to the old one which preceded it, but to the fondly remembered five-cent fare of its youth, and complains bitterly about an increase of 3 1/3 cents. A recognition by urban street railway management of the force inherent in such a widely held popular concept may explain sufficiently the slowness of urban street railway management in asserting its rights in Court, both in this jurisdiction and elsewhere; for management, if wise, is slow to do anything which may disturb its relations with the public.

The aforegoing speculation, on the part of this Court, avowedly is speculation. It is stated, however, merely to emphasize the Court's view that the assumption of the Commission as to recognition by street railway management of its "economic limits" and "point of diminishing returns" is equally speculative. Against both speculations, the Court cites again the testimony of Professor Hollander above referred to, as well as the experience of the Boston street railway system under a ten-cent fare.

(b) A rate of fare to be fair to the public must represent the fair value of the service rendered. "Value," as here used, has little to do with cost. It is subjective with the fare-paying public. It is a concept compounded of economic law and of psychology. Admittedly, it is extremely difficult to define. In the oral argument of the related cases of the People's Corporation vs. Public Service Commission and the State Committee of the Socialist Party of Maryland vs. Public Service Commission, the Court heard vigorous and able statements bearing upon this phase of the case. The Court does not wish to seem to disregard these statements. Not only do they possess a stirring human quality, but they are entitled to serious consideration as a matter of law. A Court which would be deaf to the assertion that a proposed rate of fare would compel a substantial portion of the public to walk to and from its work, a Court which would shut its

ears to a plea that working men and women ought not to have an additional dollar taken from their meagre weekly earnings in order that holders of corporate securities may wax richer, would not only be lacking in essential humanity, but would be closing its ear to the fundamental rule of law announced in Smyth vs. Ames, supra, and so often heretofore adverted to, that rates must be "fair to the public."

But a proper regard for this fundamental principle is to be determined neither by rhetoric nor by sentiment. In the first place, the extreme difference of 2½ cents between a 7½-cent fare and a ten-cent fare amounts to only thirty cents for six round trips per week. In the next place, while it probably is true that many individuals in a city like Baltimore are living so close to their own "economic limits" that a difference of only a few cents a week may impose actual hardship upon them, that fact cannot exercise a controlling influence; and the Court must subordinate it to the principles of law which are binding in the decision of the question.

It has been said that the question under consideration is subjective with the public and that the answer to it depends partly upon psychology. But it can be approached, and the Court thinks it should be approached, objectively. A dollar today is not the same thing as a dollar in 1913. Its purchasing power is less; and dollars are not distributed through the community in 1928 precisely as they were distributed in 1913.

The Court thinks it reasonable to begin with the assumption that a five-cent car fare in 1913 was "fair to the public." According to the testimony of *Professor Hollander, Record, page* 3057 *to page* 3170, the best available official sources of information show that the cost of living is now 173 per cent. of what it was in 1913. Commission's counsel (*Brief, page* 36), admit that this fact alone makes a fare of between eight and nine cents in 1928, the exact equivalent of a fare of five cents in 1913. Of course that would not be so unless the people who have to pay the fare are earning $1.73 in 1928, as against $1 that they were earned in 1913. Are they doing so?

The same statistical data produced by Professor Hollander answer this

question by showing that, on the average, work for which wage-earners were paid $1 in 1913, now yields then $2.20. This Court confesses its hesitancy to accept at par any economic conclusion based upon statistical analysis. All statistical data are very pliable. Nevertheless, the figures quoted are from the best sources available and they are not contradicted by anything in this record. Objectively, they seem to show that the increased fares herein under consideration will be "fairer to the public" in the sense that, tested by the real purchasing power of the wage-earning public, they will cost that public no more than did the admittedly fair five-cent car fare of pre-war days. This seems to the Court to be full and substantial compliance with the salutary rule of law announced in *Smyth vs. Ames*. Furthermore, the Court observes the following in the opinion of the Commission as bearing upon this same question of value of service, viz.:

"In fact, taking all things into consideration, including the cost of giving the service, the extension of lines and fare zones, the greater transfer privileges, the auxiliary bus lines and the like, the Commission believes that street car riders as a whole today receive relatively much more for the fare they pay than they ever received for a five-cent fare." *Opinion of Commission, page 9.*

4. Finally, on this branch of the case, it is urged by Commission's counsel that the Court should not interfere by injunction until a test of the effect of the rate under actual operation has been made. A number of authorities are cited in support of this proposition, notably *Pa. Railroad Company vs. Public Service Commission*, 126 Md. 59, 80.

An examination of these cases demonstrates that the principle invoked has no proper application in the instant case. That principle applies where the evidence is conflicting or uncertain as to the probable remunerative effect of a new tariff. As quoted by the Maryland Court of Appeals, "It can soon be settled which is right, the railroad company's officers or the railroad commission, in their view of the effect of the Commission's tariff of rates by allowing the tariff to go into operation." But in the instant case, both the Commission and the Company agree that the rate ordered by the Commission will yield a maximum return of 6.26 per cent. In the Court's view, such return is unreasonably low and confiscatory. Therefore nothing would be gained by permitting its operation over a trial period.

## QUESTION III.

### Was the Action of the Commission in Fixing the Present Value of Company's Property to Be $75,000,000 Unlawful?

Without extending this already too long opinion, it is sufficient to say that the Court has considered carefully the Company's contentions in this regard and finds that the Commission, in this portion of its action, exercised fairly its "legislative" or administrative discretion. At the most, it might be said that the Commission make a mistaken application of right standards. But it did not, as in its action in fixing depreciation reserve, use erroneous and illegal standards. Error of this kind, if there be error, is not subject to judicial review.

## QUESTION IV.

### Was the Order of the Commission in Abolishing the Second Fare to Halethorpe Unlawful?

What has been said in the last preceding section of this opinion applies with even greater force to this question. In fact, the Court fully agrees with the Commission's conclusion upon this question. Of course, the estimated loss of $40,000 of annual revenue resulting therefrom, is a factor to be taken into consideration in the ultimate determination of a fair rate of return.

## CONCLUSIONS.

From what has been said it follows that this case must be remanded to the Commission for the taking of additional testimony on the question of depreciation reserve.

Should the Commission, after fixing finally what it conceives to be a proper legal allowance for depreciation reserve, make a final order fixing rates of fare upon a basis which will yield a rate of return upon the rate base of $75,000,000 of not less than 7½ per cent. and not more than 8 per cent., such rates of fare, so fixed, will be permitted to stand. If, however, the Commission shall adhere to its ruling that a fair rate of return is less than 7½ per cent., and shall by its order establish

rates of fare in accordance with that ruling, then the Court will be required, in accordance with this opinion, to issue its injunction. Whether such injunction shall issue, as well as the terms and conditions which may be annexed to it, are questions which can not be decided until the Commission shall have taken further action.

The case is hereby remanded to the Commission; and an appropriate order, to that effect, will be signed.

---

THE PEOPLE'S CORPORATION
VS.
THE PUBLIC SERVICE COMMISSION OF MARYLAND.

---

What has been said by the Court in its opinion this day filed in the case of United Railways & Electric Company vs. The Public Service Commission renders it unnecessary to file any opinion in this case. A final order should not be signed herein, however, until the principal case is disposed of finally. At that time the bill herein will be dismissed.

---

THE STATE COMMITTEE OF THE SOCIALIST PARTY OF MARYLAND
VS.
THE PUBLIC SERVICE COMMISSION OF MARYLAND.

---

Reference is made to the opinions of the Court in the case of the United Railways & Electric Company vs. Public Service Commission this day filed and in the case of People's Corporation vs. Public Service Commission this day filed. The only thing that needs to be added to what has been said in the latter case is that the Court is of the opinion that it is bound by the decision of the Court of Appeals in the valuation case of Miles vs. Public Service Commission, 151 Md. 337 as to the inclusion of easement value in the rate base; and that it accepts as binding the opinion of Frank, J., in the lower court in the same case on the question of the inclusion of "Going Value" as a part of the rate base.

No final order should be signed in this case until final disposition is made of the principal case. At that time the bill herein will be dismissed.